FILED'08 JUN 24 16:27USDC-ORP

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

LARRY D. BAYS,                    )
                                  )
            Plaintiff,            )
                                  )        CV 07-6194-PK
      v.                          )
                                  )        FINDINGS AND
MICHAEL J. ASTRUE, Commissioner of Social  )        RECOMMENDATION
Security,                         )
                                  )
            Defendant. _____ )

PAPAK, Magistrate Judge,

Plaintiff Larry Bays challenges the Commissioner's decision denying his applications for

disability insurance benefits and supplemental security income payments under Titles II and XVI of

the Social Security Act. The court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The

Commissioner's decision should be reversed and remanded for further proceedings.

The court reviews the Commissioner's decision to ensure that proper legal standards were

applied and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g);

*Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). The administrative law judge ("ALJ") applied the five-step sequential disability determination process set forth in 20 C.F.R. §§ 404.1520 and 416.920. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). Bays contends the ALJ improperly assessed his residual functional capacity ("RFC"), thereby undermining the conclusion at step five of the decision-making process.

The RFC assessment describes the work-related activities a claimant can still do on a sustained, regular and continuing basis, despite the functional limitations imposed by his impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184. The RFC assessment must be based on all the evidence in the case record, and the ALJ must consider all allegations of limitations and restrictions. SSR 96-8p, 1996 WL 374184 * 5.

Bays contends the ALJ failed to properly evaluate his testimony and the statements of three medical sources when assessing his RFC. As a result, Bays argues, the ALJ's RFC assessment did not accurately reflect all of his functional limitations and led the ALJ to erroneously conclude he remains capable of performing work that exists in the national economy.

I.    **RFC Assessment**

A.    **Bays' Testimony**

Bays testified that he worked as a convenience store clerk until 1999, when he was unable to continue due to pain in his joints. He attempted to work at temporary jobs during 2000. Initially, the pain was worst in the hips and his physician suggested hip replacement surgery might be necessary. At the time of the hearing in March 2006, he alleged severe pain in the hips and shoulders. Admin. R. at 50-52.

Bays testified that he must use crutches with arm braces for balance. *Id.* at 56. He has never been evaluated or diagnosed with a vestibular disorder to account for his alleged disequilibrium. *Id.* at 66. Bays' attributes his balance problems to medication side effects. *Id.* at 56. During the relevant time, Bays' pain medications have included marijuana and a combination of narcotic analgesics, such as Hydrocodone, Dilaudid, Oxycodone, and Methadose. For stress, anxiety and sleep difficulty, Bays has used benzodiazepines including Alprazolam and Lorazepam, and a tricyclic antidepressant medication. *Id.* at 59-60.

Bays testified that he experiences anxiety and panic when he interacts with other people. Standing in line, shopping in a crowded or busy store, or participating in any group activity causes breathing difficulty and tunnel vision. During his working life, he had difficulty interacting with supervisors and coworkers. *Id.* at 70-71.

Bays sought mental health treatment in July 2002 to help him tolerate attending school functions with his children. He has been participating in individual counseling sessions on and off since that time. With counseling and medication he is better able to shut out the outside world so that he can function when he is in public. *Id.* at 73-74.

The ALJ's RFC assessment reflects that she accepted much of Bays' testimony. The ALJ found that pain limits Bays to light and sedentary work excluding more than occasional reaching with the right arm and the use of ladders or scaffolds. The ALJ found side effects of medications made work in an environment with hazards such as moving machinery or heights inappropriate for Bays. The ALJ also found the effect of medications on Bays' ability to understand, remember, and carry out instructions limited him to work requiring only simple tasks. Finally, the ALJ accepted Bays' assertion that he has significant psychological limitations which preclude work in a crowded

work setting, involving close interactions with co-workers, or requiring interactions with the general public. *Id.* at 31.

The ALJ rejected Bays' testimony to the extent he alleged functional limitations in excess of those in the RFC assessment. A comparison of the RFC assessment to Bays' subjective statements reveals the ALJ effectively rejected his claims of limitations due to hip and lower back pain, impairment of the left shoulder, and impaired ability to interact appropriately with supervisors. The ALJ also rejected the implication that Bays is unable to perform any kind of work.

In deciding whether to accept subjective symptom testimony, an ALJ must perform two stages of analysis. The first stage requires a determination of whether claimant has produced objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged. *Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996); *Cotton v. Bowen*, 799 F.2d 1403, 1407-08 (9th Cir. 1986). The ALJ found Bays' statements regarding impairments from hip and lower back pain did not pass the first stage of analysis because objective evidence did not support any medically determinable impairments that could reasonably be expected to produce the severe hip and lower back symptoms Bays alleged. Admin. R. 29-31.

Bays reportedly did not see a physician for 25 years before September 28, 2001. *Id.* at 321. He was then examined by Lee McCullough, M.D., who found nothing remarkable in his physical examination. Dr. McCullough diagnosed probable osteoarthritis to explain Bays' subjective description of diffuse joint pain. He diagnosed probable encapsulitis to explain Bays' bilateral shoulder pain. *Id.* at 318.

Over the ensuing months, Bays had similar benign physical examinations, but continued to report diffuse pain in the joints. *Id.* at 311-17. In July 2002, Harold Anderson, M.D., obtained

normal findings in a physical examination, but presumed Bays had severe degenerative hip disease after observing his "waddling gait." *Id.* at 311.

On November 20, 2002, Bays had diagnostic images made of both hips. According to the radiologist, neither hip showed evidence of arthritis. *Id.* at 333. Dr. McCullough, however, felt the films suggested "some relative acetabular subchondral sclerosis" consistent with osteoarthritis. *Id.* at 307. In March 2003, Dr. McCullough again obtained benign findings on physical examination, including full range of motion of the hips without indications of pain. Dr. McCullough concluded, "I do not think there is anything wrong with his hips." *Id.* at 303. The ALJ notes that, contrary to claimant's testimony, medical records do not indicate that Dr. McCullough ever suggested hip replacement surgery. *Id.* at 30.

Dr. McCullough ordered radiological images of the lumbosacral spine to rule out referral pain from nerve root compression due to stenosis of the spinal canal. *Id.* The diagnostic images obtained in May 2003, showed only mild degenerative changes, without indications of stenosis of the spinal canal or nerve root compression. *Id.* at 332. Bays also had normal results on a battery of specialized blood tests for rheumatic diseases, suggesting that conditions such as rheumatoid arthritis and lupus could not account for his symptoms. *Id.* at 303, 330.

In February 2004, Bays presented with, among other ailments, limited range of motion in the lumbosacral spine. Dr. McCullough ordered a series of MRI studies, including images of the lumbosacral spine. *Id.* at 289-90. The MRI examination on June 16, 2004, showed a normal lumbosacral spine without any indication of lumbar radiculopathy to explain his symptoms of chronic low back pain radiating to the hips and legs. *Id.* at 281, 324. In February 2006, diagnostic

images of the thoracic spine showed mild degenerative changes described as normal for Bays' age. *Id.* at 573.

This medical evidence is consistent with the ALJ's finding that Bays failed to identify objective medical evidence of an underlying impairment that could reasonably be expected to produce severe hip and lower back pain, resulting in functional limitations exceeding those in the RFC assessment. Accordingly, Bays failed to surmount the threshold test regarding the credibility of those allegations. *Smolen*, 80 F.3d at 1281-82; *Cotton*, 799 F.2d 1407-08.

At the second stage of credibility analysis, an ALJ may discredit a claimant's testimony regarding the severity of symptoms by providing clear and convincing reasons supported by substantial evidence. *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *Smolen*, 80 F.3d at 1283. The ALJ must make findings "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995).

The ALJ may consider objective medical evidence and the claimant's treatment history. *Smolen*, 80 F.3d at 1284. The ALJ may also consider the claimant's daily activities, work record, and the observations of physicians and others with personal knowledge of the claimant's functional limitations. In addition, the ALJ may employ ordinary techniques of credibility evaluation, including prior inconsistent statements concerning the symptoms and other statements by the claimant that appear to be less than candid. *Id.*; SSR 96-7p, 1996 WL 374186. Here the ALJ considered these factors and made specific findings to support her credibility determination. *Id.* at 31-33.

The ALJ considered the objective medical evidence and concluded it did not support limitations in excess of those in her RFC assessment. As noted previously, the medical evidence did

not support Bays' assertions regarding hip and lower back limitations. The ALJ could reasonably find Bays' lack of credibility with respect to those assertions reflected adversely on the credibility of the remainder of his subjective statements.

The ALJ acknowledged medical evidence supporting neck and shoulder pain. In June 2004, an MRI study of the cervical spine showed mild degenerative changes, a disc bulge, and slight canal stenosis in the cervical spine which did not produce an abnormal signal within the spinal cord. *Id.* at 281, 324. In June 2006, an x-ray study showed chronic calcific tendonitis in the supraspinatus tendon of the left shoulder. *Id.* at 535. This evidence supports Bays' assertions of limitations in exertional capacity and the use of both upper extremities. The ALJ's RFC assessment did not include any limitation in the use of the left shoulder or explain why she rejected Bays' claim of bilateral symptoms.

Next, the ALJ found the limiting effects of Bays' impairments improved significantly in the course of treatment. In November 2001, Bays reported his pain level at 2 or 3 out of 10 when taking prescribed pain medication. *Id.* at 316. He reported similar relief in June 2002. *Id.* at 312. His ability to perform basic activities of daily living and childcare were dramatically more stable with chronic pain therapy. *Id.* at 305, 308.

Similarly, Bays achieved improvement in his psychological symptoms with mental health medications and therapy. In October 2002, after beginning medication therapy, Bays reported he was able to get out into the community with anxiety remaining at a "tolerable level." *Id.* at 403, 404. With treatment Bays was able to engage in social activities, participate in court proceedings, and enjoy activities in crowded settings such as the circus and a crowded auditorium. *Id.* at 304, 307, 387, 403. In May 2003, Bays reported experiencing no panic attacks since Christmas and felt his

medication was effective as long as he avoided "crowds in the hundreds." *Id.* at 385. Bays participated in a Goodwill jobs program without reporting panic or agoraphobia. *Id.* at 180-94, 384. In April 2005, his anxiety was not severe enough to cause him to avoid social situations. *Id.* at 450. He was able to interact with social agencies for assistance with housing. *Id.* at 443.

In his individual counseling sessions thereafter, Bays reported situational anxiety, anger, and frustration related to a stressful relationship with his significant other, a difficult housing situation, financial difficulties, and legal problems. He did not describe episodes of panic or agoraphobia in social situations or problems interacting with the general public.

The ALJ could reasonably conclude that, while following prescribed treatment, Bays realized improved functioning which permitted him to engage in activities that did not require close contact with coworkers or interactions with the general public. The improved function does not explain why Bays required limited interactions with coworkers and the general public, but had no similar limitation for interactions with supervisors.

The ALJ also noted Bays' failure to discontinue marijuana use despite its contribution to his anxiety. Bays was a chronic daily marijuana user. *Id.* at 318. In July 2002, his mental health counselor advised him that increased anxiety is a common side effect of marijuana use. *Id.* at 422. In August 2002, Bays continued daily use of marijuana even though "he readily admits it sometimes increases his anxiety." *Id.* at 408. In June 2005, Bays admitted a decrease in anxiety when he abstained from marijuana. *Id.* at 436, 474. The ALJ could reasonably expect that if Bays had suffered from the debilitating anxiety symptoms alleged, he would have made some effort to stop using marijuana to alleviate his symptoms. He did not stop using marijuana until he was required to do so to meet conditions of probation. *Id.* at 435, 439, 465.

The ALJ considered Bays' work history and noted that his impairments had existed for many years before Bays stopped working. For example, in February 2004, Bays reported to a treating source that his back pain had persisted for 20 years and his shoulder pain for 6 or 7 years. *Id.* at 289. His anxiety, panic attacks, and agoraphobia allegedly originated in the 1980s or even in childhood. *Id.* at 224, 409. Accordingly, these impairments existed during most or all of Bays' working life and did not preclude substantial gainful activity. Bays reported that his anxiety, panic attacks, and agoraphobia did not interfere when he worked graveyard shifts and other jobs that involved limited interaction with others. *Id.* at 224, 388, 421.

While Bays contends his impairments have worsened over time, the objective physical findings suggest only mild degenerative changes and the psychological evidence suggests improved functioning since he began receiving appropriate treatment. Accordingly, it was reasonable for the ALJ to find that Bays' past ability to work while his impairments were untreated reflects adversely on the credibility of his assertion that he cannot now work while receiving appropriate treatment.

The ALJ found indications that Bays considers himself capable of working in appropriate circumstances. In March 2002, he reported engaging in lumber work and having difficulty bidding on unspecified jobs. *Id.* at 314. In August 2003, Bays applied for work at a convenience store and actively pursued other jobs. *Id.* at 375. In August and September 2003, Bays reported working at a flea market with occasional heavy lifting. *Id.* at 296, 297.

In April 2005, Bays indicated lack of funds to relocate and purchase clothing was the primary road block in his pursuit of employment. He believed a former employer would hire him if he could relocate. *Id.* at 348, 451. Bays complained his age, appearance, lack of recent work and criminal history were strikes against him in the job market. *Id.* at 375. The ALJ correctly noted that a

claimant's inability to get work for these reasons cannot be the basis of a finding of disability.  20 C.F.R. §§ 404.1566(c), 416.966(c).

The ALJ could reasonably conclude from this work history and job seeking activity that Bays perceived himself capable of performing work in appropriate circumstances.  This reflects adversely on Bays' claim that he cannot perform any substantial gainful activity.

The ALJ considered Bays' reported daily activities and found them inconsistent with the functional limitations claimed in his testimony.  Bays reported he is the primary care-giver for four children and a bedridden partner.  Admin. R. at 309, 343, 456.  He performs the majority of the household chores, including meal preparation, laundry, and firewood gathering.  *Id.* at 227.  For amusement, he engages in gardening, motorcycle riding, target shooting, and using the computer as a family entertainment tool. *Id.* at 418, 450.  He maintains a support network of several male friends. *Id.* at 456, 459.  As noted previously, Bays engaged in social activities, participated in court proceedings, took his children to the circus, attended a crowded function at a college auditorium, and hosted a backyard barbecue.  *Id.* at 298, 304, 307, 387, 403. He participated in a jobs program and interacted appropriately with social agencies for housing assistance.  *Id.* at 180-94, 384, 443.

These activities are not equivalent to work activities performed within the rigors of a work setting.  Nonetheless, they reasonably suggest that Bays is capable of performing a range of light and sedentary tasks on a daily basis and of interacting with others without decompensating.  The ALJ could reasonably conclude that these activities are inconsistent with any implication in Bays' testimony that he is incapable of performing substantial gainful activity with appropriate limitations.

The ALJ identified inconsistencies indicating that Bays was not entirely candid in his subjective reporting.  For example, in August 2002, he told a mental health counselor he had been

a "speed freak" in his younger years and had also used other illicit substances. *Id.* at 407. Elsewhere he admitted a 1970 diagnosis of drug abuse and a history of chemical dependency from childhood until 1992. *Id.* at 417, 421, 456. Despite this history, when requesting medication from Dr. McCullough in October 2002, Bays said "I am 46 years old and I have never abused drugs." *Id.* at 308.

Bays also made inconsistent reports regarding his chronic daily marijuana use. In February 2004, Bays reportedly "suspended" his marijuana use in case it contributed to his anxiety. *Id.* at 357. In November 2004, however, he was arrested for growing marijuana without authorization. *Id.* at 278. In May 2005, Bays again reported he had stopped using marijuana. *Id.* at 467. Urine toxicology screens in July and August 2005 remained positive for cannabinoids. *Id.* at 471-74. The ALJ could reasonably find these statements appeared to be less than candid and reflected adversely on Bays' credibility.

To summarize, the ALJ accepted Bays' assertions that neck and shoulder pain limited the use of his right arm, diffuse joint pain limited him to light and sedentary levels of exertion, psychological deficits limited his ability to interact with others, and medication side effects limited him to simple tasks and precluded work in hazardous situations.

The ALJ did not credit Bays' assertions of additional limitations due to impairments in the hips and lower back because the objective and clinical evidence did not support the existence of any medically determinable condition that could reasonably be expected to produce such additional limitations. She did not credit his assertion that his remaining impairments were disabling because the objective medical findings were meager, his treatment history showed improvement in function, his work history and active job search suggested he remained capable of work with appropriate

limitations, his reported activities did not comport with complete disability, and inconsistent subjective statements in the record suggest Bays was not always scrupulously candid in his subjective reports to treating sources.

The ALJ's findings with respect to Bays' credibility generally and the credibility of his subjective statements regarding hip and back impairments, right shoulder limitations, difficulty interacting with coworkers and the general public, and inability to perform any substantial gainful activity are based on inferences reasonably drawn from the record as a whole. The findings are sufficiently specific to permit the court to conclude that she did not reach these findings arbitrarily and those findings should be upheld. *Orteza*, 50 F.3d at 748; *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d at 1193; *Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995).

With respect to Bays' assertions that he has additional functional limitation in the use of his left shoulder and interacting appropriately with supervisors, the ALJ's decision is lacking. The ALJ did not assert specific facts or reasons to reject Bays' subjective statements regarding these impairments, nor did she specifically include them in her claimant's RFC. The court cannot determine whether the ALJ rejected those assertions arbitrarily. That portion of the ALJ's credibility determination cannot be sustained. *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003).

## B.    Medical Source Statements

Bays contends the ALJ failed to give proper weight to the opinions of William Salbador, M.D., Randy Olander, Ph.D., and Dr. McCullough.

### 1. The Opinion of Dr. Salbador

Dr. Salbador performed a single psychiatric evaluation of Bays in February 2004. Admin. R. at 224-33. The examination consisted of a clinical interview, mental status examination, and review of a report by Keith Murdock, Ed.S. *Id.* at 224. In his mental status examination, Dr. Salbador did not identify deficits in Bays' general appearance, speech/motor examination, thought processes or thought content. Bays was oriented and able to follow a three-step command without difficulty. His short-term and immediate memory were intact and he demonstrated average intelligence. *Id.* at 227.

The Murdock report was an evaluation for possible learning disorders. The report indicated that Bays had no learning disorder and possessed average or better learning potential, intellect and memory. Mr. Murdock believed these abilities could be affected by Bays' impulsivity and anxiety. He opined that Bays would function best in a setting that was free of other people, and imposed very little frustration. *Id.* at 196-203.

Dr. Salbador prepared a Rating of Impairment Severity Report on March 3, 2004. He indicated Bays had marked restriction in activities of daily living based on Bays' description of limitations caused by chronic pain and his alleged inability to use public transportation due to panic disorder. He opined Bays had extreme limitation in social functioning based on Bays' reported history of difficulties in interpersonal relationships and multiple short-lived jobs. Dr. Salbador found moderate impairment of concentration, persistence, or pace secondary to panic and anxiety. He found Bays had experienced one or two episodes of decompensation due to his symptoms. *Id.* at 234-35.

The ALJ gave Dr. Salbador's opinion little weight. *Id.* at 33. An ALJ must provide clear and convincing reasons for rejecting the uncontradicted opinion of an examining physician; the opinion

of an examining doctor, if contradicted by another doctor, can be rejected for specific and legitimate reasons that are supported by substantial evidence in the record. *Lester v. Chater,* 81 F.3d 821, 830-31 (9th Cir. 1995).

Dr. Salbador's findings were inconsistent with the opinion of the state reviewing psychologist, who indicated Bays had mild restriction of activities of daily living, moderate impairment of social functioning, mild impairment of concentration, persistence or pace and no episodes of decompensation. Admin. R. 248. She opined that Bays could work with appropriate restrictions. *Id.* at 266. Similarly, Tom Dooley, Ph.D., the psychological expert at the hearing, opined that Bays had mild restriction in activities of daily living, moderate limitation of social functioning, mild impairment of concentration, persistence or pace, and no episodes of decompensation. Dr. Dooley opined Bays could work if he avoided crowded settings and did not engage in close interactions with the general public; he suggested Bays would also have "supervisor problems." *Id.* at 82, 85. Dr. Salbador's opinion was also contrary to Mr. Murdock's opinion that Bays had great potential to be a good employee in very limited conditions. *Id.* at 202.

Because of this conflict among the medical opinions, the ALJ was required to provide specific, legitimate reasons supported by substantial evidence before rejecting Dr. Salbador's opinion. *Lester,* 81 F.3d at 830; *Widmark v. Barnhart,* 454 F.3d 1063, 1066-67 (9th Cir. 2006).

The ALJ offered three reasons for giving Dr. Salbador's opinion little weight. First, she found "such severe functional limitations are not supported by the other evidence of record, which shows improved functioning with medication and treatment." Admin. R. at 33. This statement lacks specificity, but a fair reading of the ALJ's decision suggests it refers to the evidence of improvement she summarized relative to her credibility discussion. *Id.* at 32.

As described previously, Bays initially reported daily panic attacks, but received benefit from a combination of Xanax and other mental health medications together with individual counseling sessions. *Id.* at 304, 307, 365, 385, 403-04, 405. He also reported increased activities in public and social settings. *Id.* at 180-94, 298, 304, 307, 384, 387, 403, 443 .

Bays argues his improvement was short-lived because he developed a tolerance for Xanax. It is true Bays sometimes reported that Xanax was becoming less effective over time. For example, in March 2003, Bays told his mental health counselor that Xanax was becoming somewhat less effective. *Id.* at 387. Contemporaneously, however, he told Dr. McCullough he felt better than he had in years, in part because Xanax was controlling his panic symptoms. *Id.* at 304. In May 2003, Bays reported he had experienced no panic attacks since Christmas. *Id.* at 385. In November 2003, his mental health counselor noted, "Panic attacks are well managed with use of Xanax." *Id.* at 365.

On February 13, 2004, in her annual review of Bays' treatment over the preceding year, Bays' mental health counselor indicated, "He reported initial success with the Xanax, but found there was a tolerance effect and that he still experienced panic in large social settings." *Id.* at 357. Bays describe the large social settings that bothered him due to the limited effect of Xanax "i.e. no crowds numbering in the hundreds." *Id.* at 385. Contemporaneous treatment notes from the preceding year indicate that, despite his tolerance, he continued to receive benefit from his treatment overall.

In addition, the tolerance effect was limited by adjustments in medication. On March 1, 2005, Bays again reported increased tolerance to Xanax and found himself isolating much of the time. *Id.* at 343. After adjusting his medications, however, Dr. McCullough indicated "Xanax at the current dose schedule works well." *Id.* at 482. Based on the foregoing, it appears Bays continued to receive benefit from his overall treatment regimen and demonstrated improved function despite

developing some degree of tolerance to Xanax. In addition, the tolerance effect was minimized by appropriate adjustments in Bays' medications. Accordingly, the tolerance he developed did not undermine the ALJ's finding that Bays had improved function with treatment and functioned at a level inconsistent with Dr. Salbador's findings.

The second reason the ALJ offered for rejecting Dr. Salbador's opinion was that Bays' presentation to Dr. Salbador differed from his presentation to Mr. Murdock. The ALJ found Bays was hostile and upset when examined by Dr. Salbador but generally cooperative in Mr. Murdock's evaluation. This is not supported by the record. According to Dr. Salbador's report, Bays' was "cooperative, interested, and attentive for the most part," although Dr. Salbador detected a low-grade hostility during the interview. *Id.* at 227. Even if Bays was less cooperative with Dr. Salbador, the ALJ did not explain why the difference would undermine Dr. Salbador's conclusions. Accordingly, this reason is not sufficiently specific and the court cannot determine whether it is legitimate.

The third reason for rejecting Dr. Salbador's opinion was his statement that Bays "doesn't really show a lot of evidence that he is willing to be any sort of equal participant in attempting to improve his situation financially or occupationally." *Id.* at 228. The ALJ interpreted this statement to indicate Bays lacked motivation to overcome his impairments and obtain employment. Such a person could reasonably be expected to overstate his limitations so that he would not have to work. Bays argues the statement simply reflects that Dr. Salbador found Bays has a personality disorder which makes him "very inflexible/non-adaptable." *Id.* at 235.

The court cannot conclude that the ALJ's interpretation is irrational. The ALJ's factual findings must be upheld if supported by inferences reasonably drawn from the record and if evidence

exists to support more than one rational interpretation, the court must defer to the Commissioner's findings. *Batson,* 359 F.3d at 1193; *Andrews,* 53 F.3d at 1039-40.

Because the ALJ offered legitimate reasons supported by substantial evidence for giving Dr. Salbador's opinion little weight, and her findings are sufficiently specific for the court to conclude that she did not reject the opinion arbitrarily, the ALJ's evaluation of Dr. Salbador's opinion should be sustained.

### 2. The Opinion of Dr. Olander

Dr. Olander took over Bays' mental health counseling in December 2005. Admin. R. 507. He saw Bays in individual counseling sessions on a weekly basis. On March 6, 2006, Dr. Olander wrote a letter stating that Bays had persistent and severe anxiety, an extreme fear of social situations, and a constellation of symptoms consistent with Post Traumatic Stress Disorder ("PTSD"). Dr. Olander opined "it would be close to impossible to expect the client to tolerate a work setting at any consistent level an employer would require." *Id.* at 493. "Due to [his avoidant nature and uncontrolled irritability] I would predict an overabundance of absenteeism and conflicts with supervisors as well as anyone else Mr. Bays may encounter." *Id.* The ALJ gave Dr. Olander's opinion no weight.

Dr. Olander's conclusion that Bays would be unable to consistently sustain work in any work setting conflicts with the opinions of the state reviewing psychologist and Dr. Dooley, described previously. Accordingly, the ALJ was required to provide specific, legitimate reasons supported by substantial evidence before rejecting his opinion. *Lester,* 81 F.3d at 830; *Widmark,* 454 F.3d at 1066-67.

The ALJ gave three reasons for discrediting Dr. Olander's opinion. The most significant was Dr. Olander's opinion conflicted with the treatment records of Bays' previous therapist. The previous therapist treated Bays in individual counseling sessions from August 2002 until she transferred Bays' care to Dr. Olander in December 2005.

Dr. Olander's opinion was premised on his belief that Bays had "an extreme fear of social situations" and "huge difficulty navigating almost any social situation away from his home" with minimal stress tolerance which sets him up for confrontation even in supportive environments. Admin. R. at 492. While this description accurately describes Bays' condition when he first sought treatment in 2002, treatment records of his previous therapist reflect that he experienced significant improvement with medication and counseling. *Id.* at 304, 307, 365, 385, 403-04, 405. He engaged in social activities away from his home. *Id.* at 180-94, 298, 304, 307, 384, 387, 403, 443. He was able, with some difficulty, to cope with stress from a divorce and custody dispute, criminal prosecutions, a reportedly dysfunctional relationship with his bedridden partner, an unsuccessful search for employment, acting as primary care giver for four minor children without help from his partner, and other stressors. *Id.* at 343-405. The treatment records provide a reasonable basis to conclude that Bays has less difficulty in social functions and greater stress tolerance than Dr. Olander opined.

The previous therapist had a long treatment history with Bays and her progress notes present a longitudinal view of the improvement in Bays' functional capabilities. Dr. Olander had only eight sessions with Bays over three months. The ALJ could reasonably conclude that the therapist's treatment notes provided a more accurate description of Bays' functional level than Dr. Olander's opinion.

Despite the foregoing, nothing in the previous therapist's treatment records or the ALJ's decision addresses Dr. Olander's opinion that Bays would frequently experience conflicts with supervisors. Although the ALJ's RFC assessment reasonably accommodates potential conflicts with coworkers and the general public, it does not address interactions with supervisors. Indeed, this limitation was also supported by Dr. Dooley, who testified that Bays' antisocial, narcissistic personality traits would produce problems in interactions with supervisors. *Id.* at 85.

Accordingly, although much of the ALJ's evaluation of Dr. Olander's opinion should be upheld, the Commissioner must reevaluate his opinion regarding Bays' limited ability to interact appropriately with supervisors.

### 3. The Opinion of Dr. McCullough

Dr. McCullough was Bays' primary care provider at all relevant times and treated his complaints of pain. He also prescribed mental health medications for anxiety, panic, sleep difficulty and depression. On March 29, 2006, Dr. McCullough's staff wrote a letter indicating that Dr. McCullough was "in total agreement of Dr. Olander's opinion written on March 6, 2006." *Id.* at 569. The ALJ neglected to address the letter from Dr. McCullough's office.

The Commissioner concedes the ALJ's failure to address Dr. McCullough's opinion was error, but argues it was harmless. The letter was brief, conclusory, and did not identify clinical findings or another independent basis for Dr. McCullough to form an opinion. Accordingly, as the Commissioner argues, it was no more than an endorsement of Dr. Olander's opinion and the findings Dr. Olander offered in support. The ALJ implicitly evaluated the substance of Dr. McCullough's opinion when she evaluated Dr. Olander's letter. On remand both parties will have the opportunity to explore whether Dr. McCullough has his own independent bases for a disability opinion.

## II.    <u>Step Five Determination</u>

Bays contends the ALJ reached the conclusion that he can perform work in the national economy based on vocational testimony that did not accurately reflect all of his functional limitations.

At step five, the Commissioner has the burden of showing there is work existing in significant numbers in the national economy, which a person with the claimant's RFC could perform. *Yuckert v. Bowen*, 482 U.S. 139, 141-42; *Tackett v. Apfel*, 180 F.3d at 1099-1100 (9th Cir. 1999). The ALJ can satisfy this burden by eliciting the testimony of a vocational expert ("VE") with a hypothetical question that accurately reflects all the limitations of the claimant.  *Tackett*, 180 F3d at 1099, 1101.

The ALJ elicited testimony from the VE based on hypothetical questions that reflected her RFC assessment.  As described previously, it is unclear that the ALJ adequately evaluated Bays' subjective statements and the medical evidence regarding the nature and severity of limitations in the use of the left shoulder and in interactions with supervisors. Accordingly, it is unclear the ALJ's hypothetical question accurately reflected all of Bay's functional limitations.  Because the assumptions underlying the VE's opinion may not reflect all of Bays' limitations, the ALJ could not rely on the vocational testimony to show that Bays could perform the work identified. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1998).

## III.    <u>Recommendation</u>

Based on the foregoing findings and conclusions, the Commissioner's final decision should be reversed and remanded for further proceedings to properly evaluate the medical evidence, opinion evidence and Bays' testimony to determine the nature, severity and limiting effects of Bays' left

shoulder impairment and limitation in interactions with supervisors. The Commissioner must obtain VE testimony based on assumptions that accurately reflect all of Bays' functional limitations before a disability determination can be properly reached. A final judgment should be entered pursuant to sentence four of 42 U.S.C. § 405(g).

## SCHEDULING ORDER

Objections to the Findings and Recommendation, if any, are due July 9, 2008. If no objections are filed, then the Findings and Recommendation will be referred to a district court judge and go under advisement on that date.

If objections are filed, a response to the objections is due within 10 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district court judge and go under advisement.

IT IS SO ORDERED.

DATED this 24th day of June, 2008.

Paul Papak
United States Magistrate Judge